United States District Court
For the District of Massachusetts

---

| | |
|---|---|
| Tien Nguyen, ) | |
|     Defendant-Petitioner, ) | |
| ) | |
| v. ) | No. 97-CR-10102-MLW |
| ) | |
| United States, ) | |
|     Respondent. ) | |

---

### Affidavit of Tien Nguyen (Corrected)
---

I, Tien Nguyen, being duly sworn, hereby depose and state the following:

1. I am the defendant in the above-captioned case.

2. I was born in Saigon in 1978.  My father, Tan Nguyen, had been an officer in the South Vietnamese Navy when the North Vietnamese took control of South Vietnam in April 1975.

3. My father was subsequently imprisoned and sent to a re-education camp. My father later told me that he spent five years in a re-education camp, before he came to his parents' house, and took me out of Vietnam.  I was told that my mother by then had joined the Communist Party and my father lost contact with her.

4. My father and I spent time in refugee camps in Malaysia and the Philippines.  In 1984, the United States granted my father asylum based on fear of political, religious, and racial persecution and brought me to Harrisburg, Pennsylvania to live near other members of our family.

5.  On June 8, 1984, I obtained permanent residence status as an adjustment of the child of a refugee.

6. In 1987, my father obtained a job in California as a long-haul truck driver and moved with me to Fountain Valley, California.

7. Sometime around 1993, when I was about 14 or 15 years old years old, I became extremely depressed.  I felt isolated from my friends in Harrisburg and from my father, who was away much of the time on his long-haul routes.  Because of that, I began spending time with a local group of teens known as the "Natoma Boys," and got involved in some relatively minor criminal activity.

8. In 1994, at age 16, I ran away from home and moved to Massachusetts to stay with friends. While in Massachusetts, I found work thorough temporary agencies, working as a cleaner and doing odd jobs in various factories. I never finished high school.

9. In 1996, at the age of 18, I received a phone call from one of my acquaintances in California and became involved in a check cashing scheme in the above-numbered case.

10. In April 1997, I was arrested and indicted in the US District Court for the District of Massachusetts on one count of possession of counterfeit securities under 18 U.S.C. §513(a) and one count of conspiracy under 18 U.S.C. §371. See Ex. A.

11. The federal court appointed Attorney J. W. Carney, Jr., to represent me under the Criminal Justice Act. Attorney Carney and his office represented me throughout the proceeding, from my first appearance through Judge Wolf's imposition of sentence.

12. From early on in Attorney Carney's representation, I explained that I had spent my early childhood through age six fleeing Vietnam and living in refugee camps; that I was scared to death of being deported; and that I would not and could not plead guilty if doing so would result in my removal or deportation.

13. Given these concerns, Attorney Carney advised me that he needed to obtain the assistance of an attorney specializing in immigration law who could advise us both about the immigration consequences of various courses of action in my criminal case.

14. In early June 1997, Attorney Carney's firm sent my father, with whom I had by then reconciled, a letter notifying him that it had filed a Freedom of Information Act requesting certain immigration documents relevant to my case.

15. On June 11, 1997, Attorney Carney's firm sent a letter to an immigration lawyer named Anthony Drago, outlining my situation and asking for his advice and assistance. *See* Ex. B.

16. Around that time, Attorney Carney informed me and my family that he had arranged for an experienced immigration lawyer to advise him and me on the potential immigration consequences of my criminal matter.

17. During the course of his representation of me in this case, Attorney Carney spoke with me a few times in person at the courthouse and at the Plymouth County Correctional Facility, and also by telephone.

18. From the date of my arrest to my sentencing, I was held on pretrial detention. The only direct contact that I had with an attorney during that whole time was with Attorney Carney. I did not have any direct contact with Attorney Drago. Sometime in early July 1997, Attorney Carney told me that he and his office had had discussions with Attorney Drago, and that Attorney Carney believed that I had derivative citizenship through my father and that even if my derivative citizenship could not be properly memorialized, Attorney Carney would be able to work out a plea agreement with the government that would allow me to avoid removal or deportation.

19. Sometime in the fall of 1997, Attorney Carney advised me that he and the prosecutor had entered into plea negotiations and that if I pled guilty to count one, the government was willing to move to dismiss count two, the conspiracy charge, and to recommend a sentence within a range of 15 to 21 months' imprisonment. He also informed me that, based on his understanding of his communications with Attorney Drago, that possession of counterfeit securities was not a crime of moral turpitude or an aggravated felony and that if I pled guilty only to count one, possession of counterfeit securities, I would not be subject to removal or deportation.

20. On November 10, 1997, I was transported to the courthouse. To the best of my recollection, I met with Attorney Carney in lockup, and he went over a plea agreement that had been prepared by the government. See Ex. C.

21. The plea agreement made no mention of any immigration consequences of my pleading guilty to count one. During that conversation, I again asked Attorney Carney whether I would be subject to removal or deportation and he assured me that if I only pleaded guilty to count one, I would not be subject to removal or deportation.

22. Later that day, I was brought into a courtroom for my formal guilty-plea hearing before Judge Wolf. During that proceeding, the judge asked me a lot of questions, and I pleaded guilty to count one, which charged me with possessing counterfeit securities. I don't remember if Judge Wolf mentioned any possibility of immigration consequences that could result from my pleading guilty, but it was my understanding, based on the advice I had received from Attorney Carney, that by pleading guilty only to count one, I would not, in fact, be subject to removal or deportation.

23. A few days later, I received a letter from Attorney Carney dated November 11, 1997, stating that I had done "very well at the guilty plea hearing," and that he had informed my "immigration attorney of the guilty plea, and the potential impact that it will have in [my] favor because of the dismissal of count two." Ex. D.

24. On April 3, 1998, I was brought to court for my sentencing hearing. After hearing from the lawyers, Judge Wolf imposed a sentence of 15 months' incarceration, deemed served, with 36 months supervised release on count one, and dismissed count two on the government's motion.

25. Attorney Carney subsequently sent me a copy of a letter he received from Attorney Drago dated April 9, 1998, stating that Attorney Drago had filed an application for U.S. citizenship and for a U.S. passport on my behalf. The letter also advised Attorney Carney, "I don't think that the way you arranged the plea Tien entered into, that his crime constitutes an 'aggravated felony'." *See* Ex. E.

26. Since being released from custody on this case, I have been making steady and diligent efforts to work with immigration lawyers to obtain U.S. citizenship in order to avoid removal or deportation Sometime around the 2000, 2001 time period, I learned that efforts on my behalf to obtain derivative naturalization did not succeed. Two subsequent attempts also failed, partly because my father passed away and his records were unavailable.

27. Several years later, I retained another attorney to assist me in applying for non-derivative naturalization. But in early 2015, an officer with the United States Citizen and Immigration Services ("USCIS") informed me that to be eligible for naturalization, I needed to "demonstrate that I am a person of good moral character"; that, contrary to the advice I had received, possession of counterfeit securities under 18 U.S.C. 513(a) is "an aggravated felony" under the Immigration and Nationality Act, §101(a)(43); that any person convicted of "an aggravated felony" on or after November 29, 1990 is "permanently barred from establishing good moral character"; and that I was therefore "ineligible for naturalization." See Ex. F.

28. After the 2015 CIS decision, I received advice from immigration attorneys that further appeals of that decision were likely to be futile. I moved as quickly as I could to obtain the financial means to address this issue by seeking the vacation of my 1998 federal conviction. In addition, it was not until recent changes in immigration policy changes targeting those convicted of nonviolent offenses that post-dated the inauguration of our new President in January 2017 that I was advised that removal or deportation were realistic possibilities in my case.

29. Over the course of my life, the only crime for which I have ever been convicted was the 1997 possession of counterfeit securities that I committed when I was 18 years old.

30. I am now 38 years old and have lived in this country for over 32 years as a legal permanent resident. I have been married for over nine years to a U.S. citizen. My wife and I have a seven-year-old son who is a U.S. citizen. Ever since my release from custody, I have abided by the law and have been a productive and contributing member of my community. For the past 17 years, I have been working in the field of advanced digital technology and management, and am currently the Director of Network Engineering for a company that provides statewide network infrastructure for research and educational institutions.

31. I am extremely frightened about being deported to Vietnam for several reasons. I cannot put into words how scared I am that I will be permanently separated from my wife and seven-year-old son. Without them, my life is not worth living.

32. In addition, the United States is my home. It is where all my friends and relatives live. The United States of America is the only country I have ever really known and the only place I have ever known. I view myself as being just as patriotic an American as anyone born in this country.

33. Since leaving Vietnam as a young child I have never been back. I know little about the country and do not speak Vietnamese. I do not believe that there will be any jobs for me as a digital network engineer and have no idea where and with whom I could live.

34. I am also really scared that my background as a deportee from the United States will be held against me not only by government and party officials, but also by many of the people I would be living amongst, both because I would be a deportee from the United States and because my father had been an officer in the South Vietnamese Navy when the communists took over in 1975.

35. According to the U.S. State Department 2016 Report on Human Rights Practices in Vietnam, the country is "an authoritarian state" under single-party rule by the Communist Party. That report also notes that Vietnam places severe restrictions on the civil liberties, political rights, and due process rights of citizens and residents, including "arbitrary and unlawful deprivation of life," "arbitrary arrest and detention for political activities," "police mistreatment of suspects during arrest and detention, including the use of lethal force and austere prison conditions," the "denial of the right to a fair and expeditious trial," and "limited freedom of speech" and "privacy rights." See http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2016&dlid=265386.

36. Before I agreed to plead guilty, my father and I told Attorney Carney that I would not plead guilty to any offense that would result in my removal or deportation. I was informed by him that the conspiracy count (count two) would be dismissed, that the counterfeit-securities possession count was not an aggravated felony or a crime of moral turpitude, and that a guilty plea to count one would not cause my removal or deportation. It was only based on that advice that I agreed to plead guilty.

37. Had I known that the legal advice I received was legally incorrect, I would not have pleaded guilty and would have either held out for a better plea deal or would have gone to trial. Indeed, I believe that this was Attorney Carney's own advice.

Signed under the penalties of perjury.

_____
Tien Nguyen

Dated: May 24, 2017