# United States District Court
## For the District of Massachusetts

| | | |
|---|---|---|
| Tien Nguyen, | ) | |
| Defendant-Petitioner, | ) | |
| | ) | |
| v. | ) | No. 97-CR-10102-MLW |
| | ) | |
| United States, | ) | |
| Respondent. | ) | |

## Defendant's Memorandum for Coram Nobis, Audita Querela, or Other Appropriate Relief (Corrected)

## 1. Introduction.

The defendant-petitioner, Tien Nguyen, hereby submits this memorandum in support of his petition for a writ of error coram nobis, for a writ of audita querela, or for other relief under the All Writs Act,[1] or under Rule 60(b) of the Federal Rules of Civil Procedure.

## 2. Statements of facts and prior proceedings.

### A. Background.

Tien ("Tony") Nguyen (hereafter "Mr. Nguyen") was born in Saigon in 1978.[2] His father, Tan Nguyen, had been an officer in the South Vietnamese Navy when the North Vietnamese took control of South Vietnam in April 1975.[3] Tan Nguyen was imprisoned and sent to a re-education camp.[4] After five years in a re-education camp, Tan Nguyen found his

---

[1]28 U.S.C. §1651.
[2]Nguyen Aff. ¶2.
[3]*Id.* ¶¶2-3.
[4]*Id.* ¶3.

son, who had been staying with his paternal grandparents, and fled Vietnam.[5] They left behind Mr. Nguyen's mother who by then had joined the Communist Party and lost contact with the family.[6]

Mr. Nguyen and his father spent time in refugee camps in Malaysia and the Philippines.[7] In 1984, Mr. Nguyen's father was granted asylum based on fear of political, religious, and racial persecution.[8] He brought Mr. Nguyen to Harrisburg, Pennsylvania to join other members of his family.[9] On June 8, 1984, Mr. Nguyen obtained permanent residence status as an adjustment of the child of a refugee.[10]

In 1987, Mr. Nguyen's father obtained a job in California as a long-haul truck driver and moved his family to Fountain Valley, California.[11] By 1993, separated from his friends in Harrisburg, and growing increasingly estranged from his father who was often away from their home, driving his truck, Mr. Nguyen, now 15, became depressed, joined up with a local group of young men known as the "Natoma Boys," and got involved in some relatively minor criminal activity.[12]

In 1994, at age 16, Mr. Nguyen ran away from home and moved to Massachusetts to stay with friends.[13] While in Massachusetts, Mr. Nguyen found work thorough temporary agencies, working as a cleaner and doing odd jobs in various factories.[14] Mr. Nguyen never finished high school.[15]

---

[5] *Id.*
[6] *Id.*
[7] *Id.* ¶4.
[8] *Id.*
[9] *Id.*
[10] *Id.* ¶5.
[11] *Id.* ¶6.
[12] *Id.* ¶7.
[13] *Id.* ¶8.
[14] *Id.*
[15] *Id.*

**B.** **The 1996 check-cashing scheme, Attorney Carney's representation, and the criminal proceedings in this case.**

In 1996, at the age of 18, one of Mr. Nguyen's acquaintances in California called and persuaded him to become involved in a scheme that required him to find people willing to cash forged payroll checks. After locating these people, Mr. Nguyen sent their names and contact information to a contact in California who then arranged to have checks printed with these names on it. The checks would be sent to Mr. Nguyen who would then have these people cash the checks. Mr. Nguyen kept a relatively small cut of the proceeds and passed on the rest to his California contact.

In April 1997, Mr. Nguyen was arrested and indicted on one count of possession of counterfeit securities under 18 U.S.C. §513(a) and one count of conspiracy under 18 U.S.C. §371.[16] The Court appointed Attorney J. W. Carney, Jr. to represent Mr. Nguyen under the terms of the Criminal Justice Act.[17]

As the annexed affidavits of both Mr. Nguyen and Attorney Carney make clear, from the very beginning of Attorney Carney's representation, Mr. Nguyen advised Attorney Carney that he was afraid of being deported to Vietnam, that his number-one priority was to avoid the risk of removal or deportation, and that "he would not plead guilty to any charges without assurance that his guilty plea would not result in removal or deportation and that he would assert his right to go to trial."[18] Attorney Carney arranged for Mr. Nguyen's family to retain the services of an experienced immigration attorney to advise him, Mr. Nguyen, and Mr. Nguyen's family about the immigration consequences of any convictions.[19] Even

---

[16]*Id.* ¶10.
[17]*Id.* ¶11.
[18]Carney Aff. ¶2. *See* Nguyen Aff. ¶¶12, 36.
[19]Carney Aff. ¶¶4, 5. By this point, Mr. Nguyen had fully reconciled with his father.

though this immigration attorney was hired by the family, Mr. Nguyen's only direct contacts with an attorney was with Attorney Carney.[20]

In the fall of 1997, Attorney Carney entered into plea negotiations with the prosecutor.[21] Based on his understanding of the information he had received from the immigration lawyer, Attorney Carney advised Mr. Nguyen "that that possession of counterfeit securities was not a crime of moral turpitude or an aggravated felony and that a guilty plea only to count one, possession of counterfeit securities, would avoid the potential for removal or deportation."[22]

As Attorney Carney acknowledges, on several occasions before Mr. Nguyen pled guilty to possession of counterfeit securities (count one), Attorney Carney advised Mr. Nguyen, based on his understanding of information provided by an experienced immigration attorney, that possession of counterfeit securities (count one) was not a crime of moral turpitude or an aggravated felony,[23] and that dismissal of the conspiracy count (count two) and a guilty plea only to possession of counterfeit securities (count one) would avoid Mr. Nguyen's exposure to removal or deportation."[24] For his part, Mr. Nguyen understood from Attorney Carney that the government "was willing to move to dismiss count two, the conspiracy charge, and to recommend a sentence within a range of 15 to 21 months' imprisonment," and also that "if [he] pled guilty only to count one, possession of counterfeit securities, [he] would not be subject to removal or deportation."[25]

---

[20]*Id.* ¶18.
[21]Carney Aff. ¶6.
[22]*Id.*
[23]*Id.* ¶6; *see* Nguyen Aff. ¶¶18, 19.
[24]Carney Aff. ¶¶6, 7; *see* Nguyen Aff. ¶¶19, 21-22.
[25]Nguyen Aff. ¶19.

On November 10, 1997, Mr. Nguyen was transported to the courthouse for a Rule 11 hearing and went over the plea agreement with Attorney Carney in lockup.[26]

Attorney Carney remembers that he specifically advised Mr. Nguyen that if he could not work out a plea to an offense that was not an aggravated felony, "only good things can happen for you if you go to trial,"[27] and that it has long been his practice to advise clients in Mr. Nguyen's position to go to trial if a guilty plea would place them at risk of removal or deportation.[28] During their conversation, Mr. Nguyen again asked Attorney Carney whether [he] would be subject to removal or deportation," and was "assured ... that if [he] only pleaded guilty to count one, [he] would not be subject to removal or deportation."[29] Indeed, Attorney Carney confirms that he, in fact, gave such advice to Mr. Nguyen at that time.[30]

Mr. Nguyen was subsequently brought into the courtroom for his Rule 11 hearing. Although he remembers being asked a lot of questions by the Court and pleading guilty to count one, he does not remember if the Court made any mention of possible immigration consequences of his guilty plea.[31] But as he explains in his annexed affidavit, it remained his "understanding, based on the advice he had received from Attorney Carney, that by pleading guilty only to count one, he would not, in fact, be subject to removal or deportation."[32]

As Mr. Nguyen explains in his annexed affidavit, had he "known that the legal advice [he] received was legally incorrect, [he] would not have pleaded guilty and would have either held out for a better plea deal or would have gone to trial."[33] In support of this, Attorney

---

[26]*Id.* ¶20.
[27]*See* Carney Aff. ¶3.
[28]*See Id.* ¶3.
[29]Nguyen Aff. ¶21.
[30]Carney Aff. ¶7.
[31]Nguyen Aff. ¶22.
[32]*Id.* ¶22.
[33]*Id.* ¶37.

Carney states that it had "been [his] practice in these sorts of cases where avoiding removal or deportation is a priority to encourage my clients to go to trial" because "removal or deportation is far harsher punishment than any sentence of imprisonment."[34]  Attorney Carney also reports that he "believe[s] [that he] specifically told Mr. Nguyen "only good things can happen for you if you go to trial,"[35] and that "[i]f [he, Attorney Carney] had known that a conviction for possession of counterfeit securities was or could be deemed an aggravated felony or a crime of moral turpitude that would have subjected Mr. Nguyen to removal or deportation, [he] would have advised him to hold out for a better plea deal or to go to trial.[36]

A few days after the Rule 11 hearing, Attorney Carney sent Mr. Nguyen a letter confirming his advice, stating that Mr. Nguyen had done "very well at the guilty plea hearing" and reporting that he had informed the "immigration attorney of the guilty plea, and the potential impact that it will have in his [Mr. Nguyen's] favor because of the dismissal of count two."[37]

On April 3, 1998, a sentencing hearing was held at which Judge Wolf imposed a sentence of 15 months' incarceration, deemed served, with 36 months supervised release on count one, and dismissed count two on the government's motion.[38] About one week later, Attorney Carney forwarded to Mr. Nguyen a letter he had received from the immigration attorney stating that he had applied for derivative U.S. citizenship for Mr. Nguyen and again

---

[34]Carney Aff. ¶4.
[35]*Id.*
[36]*Id.* ¶¶4, 11.
[37]*Id.* ¶8; Nguyen Aff. ¶23 & Ex. D.
[38]Nguyen Aff. ¶24.

confirming that because of the way Attorney Carney had "arranged the plea," Mr. Nguyen's

offense of conviction would not be deemed an "aggravated felony."[39]

## C.    Mr. Nguyen's subsequent efforts to address the issue.

In 2001, Mr. Nguyen completed his term of supervised release and was discharged.

Since then, Mr. Nguyen has made "steady and diligent efforts to obtain U.S. citizenship to

avoid removal or deportation."[40] Sometime around 2000 or 2001, Mr. Nguyen learned that

efforts on his behalf to obtain derivative naturalization did not succeed.[41] Two subsequent

attempts at obtaining derivative citizenship subsequently failed, partly because his father had

passed away and his father's records were unavailable.[42]

Several years later, Mr. Nguyen retained another attorney to assist him in applying

for non-derivative naturalization.[43]  But in early 2015, an officer with the United States

Citizen and Immigration Services ("USCIS") informed him that to be eligible for

naturalization, he needed to "demonstrate that [he was] a person of good moral character";

that, contrary to the advice he had received, possession of counterfeit securities under 18

U.S.C. 513(a) is "an aggravated felony" under the Immigration and Nationality Act,

§101(a)(43); that any person convicted of "an aggravated felony" on or after November 29,

1990 is "permanently barred from establishing good moral character"; and that he was

therefore "ineligible for naturalization."[44]

After receiving the decision from USCIS in 2015, Mr. Nguyen diligently sought out

the advice of other immigration attorneys and was ultimately told that further appeals of the

---

[39]Carney Aff. ¶11 & Ex. E; Nguyen Aff. ¶25
[40]Nguyen Aff. ¶26.
[41]*Id.*
[42]*Id.*
[43]Nguyen Aff. ¶27.
[44]*See Id.* ¶27 & Ex. F.

USCIS decision were likely to be futile. Mr. Nguyen them "moved as quickly as [he] could to obtain the financial means to address this issue" by reaching out to undersigned counsel.[45] Moreover, it was not until recent changes in immigration policies targeting those convicted of nonviolent offenses that emerged after the new administration took office on January 20, 2017, that Mr. Nguyen was specifically advised that removal or deportation were "realistic possibilities," notwithstanding his 32 years as a legal permanent resident, his obedience to the law since his release from custody over 19 years ago in 1998, and his family ties to this country and financial stability.[46]

**D.     The potentially catastrophic consequences for Mr. Nguyen and his family if he is deported to Vietnam.**

Mr. Nguyen is now 38 years old and has lived in this country for over 32 years as a legal permanent resident.[47] He has been married for over nine years to a U.S. citizen.[48] He and his wife have a seven-year-old son who is a U.S. citizen.[49] Ever since his release from custody, he has abided by the law and has been a productive and contributing member of his community.[50] For the past 17 years, he has been working in the field of advanced digital technology and management, and is currently the Director of Network Engineering for a company that provides statewide network infrastructure for research and educational institutions.[51]

---

[45]*Id.* ¶28.
[46]*Id.* ¶¶28-30.
[47]*Id.* ¶30.
[48]*Id.*
[49]*Id.*
[50]*Id.*
[51]*Id.*

Over the course of his entire life, the only crime for which Mr. Nguyen has ever been convicted was the 1997 possession of counterfeit securities that he committed when he was 18 years old, and for which he took responsibility and served his time.[52]

There are broad human-rights considerations that justify Mr. Nguyen's fear of being deported to Vietnam. According to the U.S. State Department 2016 "Report on Human Rights Practices in Vietnam," the country is "an authoritarian state" under single-party rule by the Communist Party.[53] According to that report, the government places severe restrictions on the civil liberties, political rights, and due process rights of citizens and residents, including "arbitrary and unlawful deprivation of life," "arbitrary arrest and detention for political activities," "police mistreatment of suspects during arrest and detention, including the use of lethal force and austere prison conditions," the "denial of the right to a fair and expeditious trial," and "limited freedom of speech" and "privacy rights."[54]

But Mr. Nguyen also has very specific and personal reasons for being "extremely frightened" about being deported to Vietnam. He is justifiably afraid that his "background as a deportee from the United States will be held against [him] not only by government and party officials, but also by many of the people [he] would be living amongst, both because [he] would be a deportee from the United States and because [his] father had been an officer in the South Vietnamese Navy when the communists took over in 1975."[55]

Since fleeing Vietnam as a young child, he has never been back.[56] He "know[s] little about the country": "do[es] not speak Vietnamese"; "do[es] not believe that there will be any

_____

[52]*Id.* ¶29.
[53]*Id.* ¶35.
[54]*Id., citing* http://www.state.gov/j/drl/rls/hrrpt/ humanrightsreportindex.htm?year =2016&dlid=265386.
[55]*Id.* ¶34.
[56]*Id.* ¶33.

jobs for [him] as a digital network engineer"; and "ha[s] no idea where and with whom [he] could live."[57]

Most significantly, Mr. Nguyen is "extremely frightened" about being deported to Vietnam because it may cause him to be "permanently separated from [his] wife and seven-year-old son," without whom his "life is not worth living."[58] For Mr. Nguyen, "the United States is [his] home, ... where all [his] friends and relatives live"; it is "the only country [he has] ever really known."[59] Ultimately, Mr. Nguyen considers himself as "being just as patriotic an American as anyone born in this country,"[60] and removal from this country would be a personal tragedy that on the equities is simply not warranted for a nonviolent offense committed over two decades ago as an 18-year-old and for which he pled guilty believing that it would not expose him to this tragic result.

## 3.    Argument.

### A.    The availability of the old writs of coram nobis, audita querela and other forms of relief under the All Writs Act, and of independent actions under Rule 60(b).

#### (1)    *The common law writs of coram nobis and audita querela are available in criminal cases to do justice in extraordinary cases.*

Since this country's founding, The All Writs Act of 1789[61] gave federal courts the authority to grant all writs — including writs of error coram nobis and audita querela — that had been traditionally available at common law.[62] The 1948 amendments to Rule 60(b) of the Federal Rules of Civil Procedure abolished the writs of coram nobis and audita querela in civil cases. But in 1954 the Supreme Court in *United States v. Morgan*, ruled that the many of common-law writs that were extant

---

[57]*Id.*
[58]*Id.* ¶31.
[59]*Id.* ¶32.
[60]*Id.*
[61]28 U.S.C. §1651.
[62]*United States v. Sawyer,* 239 F.3d 31, 37 (1st Cir. 2001).

in 1789, including the writ of coram nobis and possibly the writ of audita querela, were still available to correct errors and attack judgments in federal criminal cases. [63]

## (2)    The writ of error coram nobis.

The writ of error coram nobis is a well-established "remedy of last resort for the correction of fundamental errors of fact or law"[64] in cases where a writ of habeas corpus under 28 U.S.C. §§2241, 2254, or 2255 is unavailable. [65] Originally conceived as a civil action at common law that permitted "trial courts to correct their own fact-based errors," the writ is recognized as a "hybrid" action that provides criminal defendants a means to challenge both fact- and law-based errors that render a criminal proceeding — whether a trial or guilty plea — irregular, unjust, or otherwise invalid.[66]

To establish that issuance of the writ is "warranted" the petitioner must: (1) "explain his failure to seek earlier relief from the judgment"; (2) "show that he continues to suffer significant collateral consequences from the judgment"; and (3) "demonstrate that the judgment resulted from an error of the most fundamental character."[67] Even if all three requirements are met, the district

---

[63]346 U.S. 502, 505 n.4 (1954). *See also id.* at 511 (*quoting United States v. Hayman,* 342 U.S. 205, 219 (1952)) ("Nowhere in the history of Section 2255 do we find any purpose to impinge upon prisoners' rights of collateral attack upon their convictions."). See also *Sawyer,* 239 F.3d at 37 (observing that the authority to issue the writ of coram nobis is rooted in the All Writs Act). *See also United States v. Ayala,* 894 F.2d 425, 428 n. 4 (D.C.Cir.1990).

[64]*United States v. Castro-Tavaras,* 841 F.3d 34, 39 (1ˢᵗ Cir. 2016), *citing United States v. George,* 676 F.3d 249, 256 (1ˢᵗ Cir. 2012). *See also Sawyer,* 239 F.3d at 37(observing that the writ of coram nobis is firmly rooted in the All Writs Act).

[65]*Trenkler v. United States,* 536 F.3d 85, 97 (1st Cir. 2008) (citations omitted). *See also Sawyer,* 239 F.3d at 37-38.

[66]*Trenkler,* 536 F.3d at 94 (citations omitted). *See also Murray v. United States,* 704 F.3d 23 (1st Cir. 2013); *Sawyer,* 239 F.3d at 37; *United States v. Khalaf,* 116 F. Supp.2d 210, 213-214 (D. Mass. 1999) (*quoting Morgan,* 346 U.S. at 511-12, *quoting United States v. Mayer,* 235 U.S. 55, 69 (1914)).

[67]*Castro-Tavaras,* 841 F.3d at 39, *citing George,* 676 F.3d. at 254. *See also Murray v. U.S.,* 704 F.3d 23 (1st Cir. 2013); *Sawyer,* 239 F.3d at 38, *citing Hager v. United States,* 993 F.2d 4, 5 (1st Cir. 1993); *United States v. Mandanici,* 205 F.3d 519, 524 (2d Cir. 2000); *United States v. Barrett,* 178 F.3d 34, 56 n. 20 (1st Cir.1999).

court "retains discretion to deny the writ if the petitioner fails to show that 'justice demands the extraordinary balm of coram nobis relief.'"[68]

Where the elements for relief are established, the courts have broad latitude to grant relief, including in cases where defense counsel's acts or omissions constituted ineffective assistance of counsel,[69] and where a government official has made misrepresentations to the defendant or committed some sort of constitutional error.[70]

### (3)    *The writ of audita querela.*

Under English common law, the writ of audita querela was an alternate writ, available to parties in certain civil cases seeking "'to obtain relief against the consequences of [a] judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise.'"[71] Unlike coram nobis, audita querela permits a court to "reopen a judgment when an important matter concerning a defendant's case has arisen since the entry of the judgment." [72] Coram nobis is thus "distinguished from audita querela in that the former attacks the judgment itself whereas the latter is directed against the enforcement of the judgment," although in some cases there may be "no material difference between the two ancient writs."[73] At common law, the writ had originally been available only in civil cases, but a number of courts in recent times have recognized the writ's availability as an alternate means of challenging the consequences of a judgment in criminal cases.[74]

---

[68]*Castro-Taveras,* 841 F.3d at 39 (citing *George,* 676 F.3d at 255).

[69]*See, e.g., Khalaf,* 116 F. Supp. 2d at 217. *See also Morgan,* 345 U.S. at 511-12.

[70]*See United States v. Taylor,* 648 F.2d 565, 573 (9th Cir.1981); *Garrison v. United States,* 154 F.2d 106 (5th Cir. 1946). *See also Hirabayashi v. United States,* 828 F.2d 591, 593 (9th Cir. 1987).

[71]*United States v. Holder,* 936 F.2d 1, 2 (1st Cir. 1991) (per curiam), *citing* Black's Law Dictionary 120 (5th ed. 1979). *See also* 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure §2867 at 235 (1973).

[72]*Trenkler,* 536 F.3d at 90 n.2. (citing 7A C.J.S. Audita Querela §2, at 901 (1980)).

[73]*Id.*

[74]*See, e.g., United States v. Richter,* 510 F.3d 103, 104 (2d Cir. 2007) (recognizing that the writ "remains available in limited circumstances with respect to criminal convictions" and that "if the

The common-law writ of audita querela appears to have clearly had at least some roots in equity,[75] and courts in other jurisdictions have accordingly granted writs of audita querela vacating federal criminal convictions **solely on equitable grounds** in order to protect defendants from ongoing and significant collateral consequences of a judgment without requiring proof of any legal defect in the underlying proceeding or any postconviction legal developments that rendered the conviction unjust.[76] So, for example, in *United States v. Salgado*,[77] the petitioner was a seasonal agricultural worker who married a United States citizen and in 1948, became a permanent resident. In 1964, however, the petitioner pleaded guilty for failure to pay a transfer tax on a small amount of marijuana, and was deported and ordered not to re-enter the country for two years. The petitioner ignored the order and re-entered the country unlawfully shortly after his deportation but was not arrested until 1984 when deportation proceedings commenced. The petitioner filed a petition for

absence of any avenue of collateral attack would raise serious constitutional questions about the laws limiting those avenues, then a writ of audita querela would lie"); *Khalaf*, 116 F. Supp. 2d at 217 (finding that audita querela relief—in addition to coram nobis relief—was warranted to cure error stemming from ineffective assistance of counsel, and applying a prejudice standard less demanding than *Strickland*). *Cf. Holder, 936* F.2d at 2 ("[a]ssuming *arguendo* the writ's availability in a criminal setting, without resolving the question of "the survival and availability of this ancient and some might think outmoded writ").

[75]*See* 2 William S. Holdsworth, A History of English Law, 593 (3d ed. 1922). *See also* Caleb J. Fountain, "Audita Querela and the Limits of Federal Nonretroactivity," 1 Annual Survey of Am. L. 203, 210-221, 234 (2015), https://annualsurveyofamericanlaw.files. wordpress.com/2015/08/nys202.pdf, last visited on Mar. 2, 2017 (exploring the history of audita querela as a mechanism to mitigate the harsh consequences of a series of debt-collection statutes enacted in the fourteenth century when 'equity was not strictly separated from law, but both were administered together by the same court"; finding that over time, "[a]s the writ settled its roots in the English common law, ... its 'equitable' components apparently dominated" and that in early American cases, the writ became "a method of raising equitable challenges, even in the law courts" and "matured into a vehicle through which litigants could challenge the execution of a judgment, even if it was correctly rendered"; concluding that audita querela is both "legal and equitable in nature" and that to succeed, "[a] petitioner needs both an equitable claim ... and a legal objection based on circumstances that have changed since the rendering of judgment").

[76]Several courts have avoided ruling on the issue. *See, e.g., United States v. Fonseca-Martinez,* 36 F.3d 62, 65 (9th Cir. 1994) (holding that even if the writ of audita querela can be issued on solely equitable grounds, "appellant's case does not present sufficient equities to justify the issuance of the writ").

[77]692 F. Supp. 1265 (E.D. Wash. 1988).

audita querela relief, arguing in part that he should not be deprived of the recently created provisions of the Immigration Reform and Control Act of 1986 ("IRCA").[78] The district judge ruled that, with the sole exception of his 1964 conviction, the petitioner had been a "model resident" for 45 years, and that a refusal to grant him relief would deny him the benefit of a newly created right to which he would otherwise be entitled. Noting that a refusal to grant relief would also "strip the petitioner of access to newly created rights" under the IRCA's amnesty provisions, the district judge issued a writ of audita querela, observing that "[w]hen ... all counsel and the court can unanimously agree on the equities, and on the right result, it is a fairly safe wager that justice would be served by reaching that result."[79]

In *United States v. Ghebreziabher*,[80] the petitioner was a legal permanent resident who had been convicted of food-stamp fraud. Facing deportation, the petitioner argued that he had four U.S. citizen children and that a writ of audita querela based on equitable considerations alone should be issued to prevent his deportation to Ethiopia, which was then in the midst of a civil war. There, the court, focusing on the consequences of the petitioner's convictions, vacated one of his three convictions, observing that this would serve "the interests of justice" by vindicating the government's interest in maintaining the petitioner's criminal records, while at the same time permitting the petitioner to avail himself of the benefits of recent changes in immigration law and to avoid deportation.[81]

---

[78] 8 U.S.C. §1255a.

[79] *Salgado,* 692 F. Supp. at 1271.

[80] 701 F. Supp. 115 (E.D. La. 1988).

[81] 701 F. Supp. at 117. *Cf. United States v. Acholonu,* 717 F. Supp. 709, 710 (D.Nev.1989) (rejecting the defendant's petition for audita querela where the defendant did not raise *any* legal challenges to the underlying criminal proceeding, where passage of the amnesty provisions of IRCA alone did not constitute a defense or discharge to the defendant's conviction, and where the pure equitable grounds of the defendant's relatively brief period of postconviction rehabilitation was insufficient to outweigh the government's interest in maintaining the defendant's criminal record).

In 1991, the First Circuit headed in a different direction. In a brief per curiam decision in *United States v. Holder,*[82] the First Circuit ruled that even if audita querela remains available to attack criminal convictions, it could not be granted on "***purely***" equitable grounds. In that case, the petitioner, a seasonal agricultural worker married to a U.S. citizen sought to vacate a 17-year-old criminal conviction that permanently barred him from obtaining legal residence status. The petitioner's claims essentially rested solely on his equitable claims that he had "demonstrated rehabilitation over a very substantial period of time." The Court held that audita querela "does not and cannot, under any stretch of imagination, provide a ***purely equitable*** basis for relief independent of ***any legal defect*** in the underlying judgment."[83] Noting separation-of-powers concerns, the Court went on to hold that "if available at all, the writ of audita querela can only be available where there is a legal *objection* to a conviction, which has arisen subsequent to that conviction, and which is not redressable pursuant to another postconviction remedy."[84]

While the First Circuit in *Holder* ruled that audita querela relief will not be granted on "***purely*** equitable" considerations, it seems clear that equitable concerns have certainly played a different and

---

[82]936 F.2d 1.

[83]*Id. See also United States v. Ayala,* 894 F.2d 425, 428-30 (D.C. Cir. 1990) (noting that "teaching of *Morgan* is that federal courts may properly fill the interstices of the federal post-conviction remedial framework through remedies available at common law," but rejecting petition for audita querela relief on the purely equitable grounds on the theory that "the prospect of deportation made the continuing effect of the conviction unfair" given his relationship with an American woman and that he lived a generally law-abiding life, where the issues should have been raised in a Section 2255 motion); *United States v. Johnson,* 962 F.2d 579, 580 (7th Cir.1992) (holding that "a writ of audita querela may not be issued on purely equitable grounds"); *United States v. Reyes,* 945 F.2d 862 (5th Cir.1991) (holding that audita querela is not available to vacate otherwise final criminal conviction on purely equitable grounds where petitioner's "sole basis" for relief was that "his deportation will be an inequitable consequence of his conviction if it is allowed to stand" and that deportation would be "a greater harm for him and his family than is warranted by the government interest in maintaining his criminal record"); *United States v. Garcia-Hernandez,* 755 F. Supp. 232 (C.D.Ill.1991) (holding that audita querela not available on purely equitable grounds).

[84]936 F.3d at 5. *See also United States v. LaPlante,* 57 F.3d 252, 253 (2d Cir. 1995) (ruling that "[a]udita querela is probably available where there is a legal, as contrasted with an equitable, objection to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy").

larger role in audita querela than in coram nobis proceedings and that, while *some* legal defect or error must be asserted, courts considering audita querela should employ relaxed standards in evaluating those legal defects so long as the equities weigh heavily in favor of granting relief. In particular, this means that courts need not necessarily employ *Teague v. Lane's* high bar to the retroactive application of new rules where the equities militate otherwise.[85] Such an approach is more consistent with the "teaching of *Morgan* ... that federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law."[86] Unless this sort of approach is adopted, the availability of audita querela would "add little, if anything, to the current scheme of postconviction relief afforded by section 2255 and the writ of coram nobis."[87] And while *Holder's* separation-of-powers concerns about the legislative branch's interest in "defining the beneficiaries of the laws," and the executive branch's interest in "maintaining the integrity of convictions lawfully obtained," are understandable, it should be remembered that it was Congress that adopted the All Writs Act and it is Congress that has chosen not to curtail the availability of audita querela and the other common-law writs that have equitable features.

*(4)*     *Equitable relief under the All Writs Act.*

Even if the Court were to determine that the standards for evaluating legal errors asserted in audita querela petitions are no different that the standards for evaluating errors in coram nobis or

---

[85]*See Khalaf,* 116 F. Supp.2d at 213-14 (granting relief where the defendant credibly asserted that but for counsel's mistaken advice that a Judicial Recommendation Against Deportation would likely protect the defendant from being deported and employing a more relaxed version of the *Strickland* prejudice prong because, as other courts had found, coram nobis does not require using "the same test" ordinarily "required under *Strickland*" whether there exists "a reasonable probability that, but for his counsel's error, he would not have pled guilty and gone to trial"), *citing Mora–Gomez,* 875 F. Supp. at 1214, *citing Downs–Morgan,* 765 F.2d at 1541; *United States v. Rasco,* 697 F. Supp. 343, 345–46 (N.D.Ill.1988). *See also United States v. Mandel,* 862 F.2d 1067, 1075 (4th Cir.1988), *cert. denied,* 491 U.S. 906 (1989) (holding that coram nobis relief is available even if the error does not affect the conclusion that the defendants were guilty of criminal conduct and that the petition does not require the court to decide "if the petitioners are bad men or even if they have committed crimes.").

[86]*Ayala,* 894 F.2d at 428-30.

[87]*See Reyes,* 945 F.2d at 865.

Section 2255 motions, this Court nonetheless has the option of following other courts that have avoided the tangle of legal issues simply by applying equitable principles and basing relief directly in the All Writs Act, itself, without specifying which of the ancient writs are being called upon to support the issuance of relief. Indeed, this is what the court did in *United States v. Javanmard*,[88] where the petitioner applied for a writ of audita querela but the court granted comparable relief directly under All Writs Act, itself. In doing so the Court held that it had "wide latitude under the All Writs Act to construct any remedy necessary to 'achieve justice.'"[89]

## (5)    *Independent actions under Rule 60(b).*

Finally, this Court could instead choose to treat this petition as an "independent action." Rule 60(b) of the Federal Rules of Civil Procedure, as amended in 1946, provides for the filing of a common-law "independent action" that can "relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28 U.S.C., §1655, or to set aside a judgment for fraud upon the court."[90] As the Supreme Court held in *United States v. Beggerly*,[91] under Rule 60(b), the only remaining "procedure for obtaining any relief from a judgment" in a civil case "shall be by motion as prescribed in these rules [of civil procedure] or by an independent action."[92] As the Court explained, this common law "independent action" or "original action" sounded in equity and "appears to have been more broadly available than the more narrow writs that the 1946 amendment abolished."[93]

---

[88] 767 F. Supp. 1109 (D. Kan. 1991).

[89] *Id.* at 1111. *See also United States v. Grajeda-Perez*, 727 F. Supp. 1374 (E.D. Wash. 1989) (holding that audita querela was inappropriate to vacate conviction, but vacating conviction on equitable basis under All Writs Act).

[90] *United States v. Beggerly*, 524 U.S. 38, 44 (1998).

[91] *Id.*

[92] Fed. Rule Civ. Proc. 60(b). *See also Beggerly*, 524 U.S. at 44-45 (noting that the 1946 amendments "made equally clear, however, that one of the old forms, i.e., the 'independent action,' still survived"; the Court also noted that this was also called an "original action").

[93] *Beggarly*, 524 U.S. at 45, *citing Pacific R.R. of Mo. v. Missouri Pacific R. Co.*, 111 U.S. 505 (1884).

**B.  Trial counsel's affirmative misadvice on the deportation consequences of a guilty plea may violate a defendant's Sixth Amendment right to effective assistance of counsel during plea negotiations.**

In 2010, in *Padilla v. Kentucky,*[94] the Supreme Court held that trial counsel's "failure to advise" a client regarding the deportation consequences of a guilty plea, as well as counsel's affirmative "misadvice," both fall "within the ambit of the Sixth Amendment's guarantee of effective assistance of counsel" and are subject to *Strickland v. Washington's*[95] two pronged-test.[96] The Court further held that "counsel must inform [a] client whether [a] plea carries a risk of deportation"; that "when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear"; and that counsel's failure to provide explicit and correct advice about the likelihood of deportation constitutes ineffective assistance of counsel.[97] While the First Circuit, like other Courts of Appeals, had previously viewed deportation as a mere "collateral consequence" of a criminal conviction,[98] the Supreme Court in *Padilla* recognized that deportation is a "particularly severe penalty" that is "'an integral part ... of the penalty that may be imposed' on aliens who plead guilty to specified crimes," and that deportation can thus no longer be considered a mere "collateral consequence."[99]

Three years after *Padilla*, the Court in *United States v. Chaidez,*[100] held that *Padilla,* at least in part, announced a "new rule" for *Teague v. Lane*[101] purposes, and that defendants raising a collateral

----

[94]559 U.S. 356, 364-71 (2010).

[95]466 U.S. 668, 687-88 (1984).

[96]*Castro-Taveras,* 841 F.3d at 42 (citing *Padilla* at 364-66).

[97]*Id.* at 369. The central role played by counsel's advice during plea negotiations has since been affirmed. *See Lafler v. Cooper,* 132 S. Ct. 1376, 1388 (2012).

[98]*See United States v. Gonzalez,* 202 F.3d 20 (1st Cir. 2000),

[99]*Castro-Taveras,* 841 F.3d at 43 (citing *Padilla,* 559 U.S. at 364-66). *See also Padilla,* 533 U.S. at 322 ("We too have previously recognized that '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'") (citing *INS v. St. Cyr,* 533 U.S. 289, 322 (2001) (quoting 3 Bender, Criminal Defense Techniques §§ 60A.01, 60A.02[2] (1999)); *Delgadillo v. Carmichael,* 332 U.S. 388, 390–91 (1947) (referring to deportation as "the equivalent of banishment or exile").

[100]133 S. Ct. 1103 (2013).

[101]489 U.S. 288, 301, 305-10 (1989).

challenge to counsel's **_failure to advise_** them about the deportation consequences of a plea "cannot benefit from [*Padilla*'s] holding" if their "convictions became final prior to *Padilla*.[102] With respect to cases where counsel provided **_affirmative misadvice_** as to the deportation consequences of a guilty plea — and perhaps with respect to other forms relief with roots in equity — the matter was, until recently, less than clear.

But in *United States v. Castro-Taveras,* after a probing analysis of the pre-*Padilla* Sixth Amendment jurisprudence in this circuit and in other courts, federal and state, the First Circuit held that the principle that *Padilla's* holding on trial counsel's "affirmative misadvice" — as opposed to counsel's mere failure to give advice — did not constitute "a new rule" for *Teague* purposes; and that *Chaidez* thus does not bar relief to defendants raising a Sixth Amendment affirmative-misadvice claim in a collateral proceeding, in general, and in a coram nobis proceeding, in particular.[103] Since the district court had not provided *Castro-Taveras* with an evidentiary hearing, the First Circuit remanded his case to the district court to determine whether counsel's misadvice on deportation consequences met *Strickland's* two-prong test. As the Court in *Castro-Taveras* noted, to meet *Strickland's* prejudice prong, the defendant must "show that there is 'a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'"[104]

---

[102]133 S. Ct. at 1113.

[103]841 F.3d at 41-53 (quotation omitted) (collecting cases in this and other circuits, in the federal district courts, and in the state courts). At least one other court in this district recognized as early as 1999 that "counsel's affirmative misrepresentation [regarding the deportation consequences of a guilty plea] in response to a specific inquiry from the defendant may, under certain circumstances, constitute ineffective assistance of counsel." *Khalaf,* 116 F. Supp.2d at 213-14.

[104]*Castro-Taveras,* 841 F.3d at 51 n.14 (*quoting Premo v. Moore,* 562 U.S. 115, 129 (2011) and *Hill v. Lockhart,* 474 U.S. 52, 59 (1985).

4. **Here, this Court should grant petitioner relief, whether fashioned as a writ of error coram nobis, a writ of audita querela, a general writ under the All Writs Act, or as an independent action that will vacate Mr. Nguyen's convictions or otherwise prevent his deportation.**

In the instant case, Mr. Nguyen's petition represents one of those rare cases where the requirements for relief are clearly met and where "justice demands the extraordinary balm of coram nobis relief" or one of the other equitable forms of relief discussed above. [105]

A. **Mr. Nguyen can adequately explain his failure to seek earlier relief.**

First, Mr. Nguyen has adequately explained that "his failure to seek earlier relief from the judgment" was due to the fact that until the USCIS decision in 2015, he had continued to believe that his conviction for possession of counterfeit securities was not an aggravated felony or a crime of moral turpitude and that he was simply not subject to removal or deportation. In addition, since his conviction, he retained several immigration attorneys and has worked with them to obtain citizenship. Since the USCIS decision in 2015, he continued to seek out the advice of immigration attorneys to determine whether the appeal of the USCIS decision had merit. In addition, he moved quickly to obtain the financial means to address the issue by seeking vacation of his 1998 federal conviction. Moreover, it was not until the First Circuit handed down its decision in the *Castro-Taveras* case on October 31, 2016, that it became the law of this circuit that the *Chaidez* decision did not apply Teague's nonretroactivity rule to affirmative attorney misadvice. And finally, it was not until recent immigration-policy changes targeting those convicted of nonviolent offenses that emerged after the new administration took office on January 20, 2017, that Mr. Nguyen was specifically advised that removal or deportation were "realistic possibilities,"[106] notwithstanding his

---

[105] *See Castro-Taveras,* 841 F.3d at 39.

[106] *See* Exec. Order on Enhancing Public Safety in the Interior of the United States, dated Jan. 25, 2017 (abolishing the previous administration's Priority Enforcement Program (PEP) and authorizing Immigration and Customs Enforcement to target non-serious criminals for deportation), available at https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united. *See also* Jennifer Medina, "Trump's Immigration

32 years as a legal permanent resident, his obedience to the law since his release from custody over 19 years ago in 1998, his family ties to this country, and his demonstrated record of financial stability.

**B.     Mr. Nguyen has adequately shown that the fact of his exposure to removal or deportation to Vietnam has resulted in his suffering "significant" consequences that will likely amount to an unimaginable personal tragedy for him and his family.**

Second, Mr. Nguyen has amply shown that "he continues to suffer" "significant" consequences from the judgment that would be nothing short of a personal tragedy for him and his family. While the courts, in the wake of *Padilla*, now recognize that deportation is almost invariably a "particularly severe penalty" with serious direct and collateral consequences,[107] deportation is a particularly severe consequence in this case.

Mr. Nguyen has now lived in this country for over 32 years as a legal permanent resident. The only crime for which he was ever convicted was the 1997 possession of counterfeit securities that he committed when he was 18 years old, and for which he took responsibility and served his time. Since then he has been a law-abiding resident of this country. He has been married for over nine years and has a wife and a seven-year-old son, both of whom are U.S. citizens. And he has been a productive member of his community, working in the field of advanced digital technology and management for over 17 years, and reaching the position of Director of Network Engineering for a company providing a statewide network infrastructure for research and educational institutions.

Mr. Nguyen also has unique and compelling human-rights concerns if he is deported to Vietnam. The U.S. State Department views Vietnam as a single-party "authoritarian

---

Order Expands the Definition of 'Criminal,'" New York Times, Jan. 26, 2017, https://www.nytimes.com/2017/01/26/us/trump-immigration-deportation.html?_r=0.

[107] *See Padilla,* 559 U.S. at 364 (internal quotation & citation omitted). *See also Castro-Taveras,* 841 F.3d at 38.

state[108] that severely restricts a wide array of civil liberties and political rights, including "freedom of speech" and "privacy rights," and that routinely countenances the "arbitrary and unlawful deprivation of life," "arbitrary arrest and detention for political activities," and "police mistreatment of suspects during arrest and detention."[109]

Mr. Nguyen, moreover, has very specific and personal reasons for being "extremely frightened" about deportation to Vietnam. He does not speak the language, and has no idea where he will live and work, and how he will earn his livelihood.[110] He is justifiably terrified that the people and the government will view him with suspicion, since he will be viewed as an American and especially since his father had fought against the communists as a South Vietnamese Navy officer.[111]

Of course, the greatest tragedy for Mr. Nguyen would be his permanent separation from his wife and seven-year-old son, without whom he credibly states, his "life is not worth living."[112] As a patriotic American,[113] removal from this country would be a personal tragedy that, on the equities, is simply not warranted for a nonviolent offense committed over two decades ago as an 18-year-old and for which he pled guilty believing that it would not expose him to this tragic result.

---

[108]Nguyen Aff. ¶35.
[109]*Id., citing* http://www.state.gov/j/drl/rls/hrrpt/ humanrightsreportindex.htm?year=2016&dlid=265386.
[110]Nguyen Aff.
[111]*Id.* ¶34.
[112]*Id.* ¶31.
[113]*Id.* ¶32.

**C.**    **Third, Mr. Nguyen has amply shown the kind of fundamental error warranting coram nobis or other similar relief — that his guilty plea was taken based on counsel's affirmative misadvice that his offense of conviction was not "an aggravated felony."**

This case fits squarely within the First Circuit's holding in *Castro-Tavares*.  As the attached affidavits of both Mr. Nguyen and Attorney Carney make clear, given Mr. Nguyen's childhood experiences fleeing Vietnam and living in refugee camps, Mr. Nguyen's immigration concerns were paramount and that Mr. Nguyen and his family made clear to Attorney Carney that his priority was to avoid the risk of removal or deportation and that "he would not plead guilty to any charges without assurance that his guilty plea would not result in removal or deportation and that he would assert his right to go to trial."[114] From these affidavits, it is also clear:

- that Attorney Carney specifically advised Mr. Nguyen on several occasions before he pled guilty that possession of counterfeit securities (count one) was not a crime of moral turpitude or an aggravated felony;[115]

- that Attorney specifically advised Mr. Nguyen that dismissal of the conspiracy count (count two) and a guilty plea only to possession of counterfeit securities (count one) would avoid Mr. Nguyen's exposure to removal or deportation;[116]

- that Attorney Carney has long encouraged clients in Mr. Nguyen's position to go to trial if a guilty plea would place the client at risk of removal or deportation;[117]

- that Attorney specifically advised Mr. Nguyen that if he could not work out a plea to an offense that was not an aggravated felony, that "only good things can happen for you if you go to trial";[118] and

- that after again being advised by Attorney Carney that if he pled guilty only to count one, he would not be subject to removal or deportation, Mr. Nguyen pled guilty to count one, actually believing that he would not be subject to deportation or removal.[119]

---

[114]Carney Aff. ¶2. *See* Nguyen Aff. ¶¶12,36.
[115]Carney Aff. ¶6; *see also* Nguyen Aff. ¶¶18, 19.
[116]Carney Aff. ¶¶6, 7; *see also* Nguyen Aff. ¶¶19, 21-22.
[117]See Carney Aff. ¶3.
[118]*See* Carney Aff. ¶3.
[119]Nguyen Aff. ¶¶21, 22, 36; Carney Aff. ¶### & Ex. D.

And even after the Rule 11 hearing, Attorney Carney continued to confirm his misadvice, writing to Mr. Nguyen several days later that he had done "very well at the guilty plea hearing" and that he had informed Mr. Nguyen's immigration attorney of the guilty plea, and the potential impact that it will have in his favor because of the dismissal of count two.[120] This was again confirmed only days after sentencing when Attorney Carney informed Mr. Nguyen that the immigration attorney whose advice Attorney Carney relied on sent him a letter stating that the way Attorney Carney had "arranged the plea," Mr. Nguyen's offense of conviction did not constitute an "aggravated felony."[121]

Here, Mr. Nguyen has clearly established his entitlement to relief under *Strickland*. First, as in *Castro-Taveras*, counsel made "affirmative representations" that were, as the USCIS found in 2015, clearly contrary to the governing law at the time. Under the relevant provisions of the Immigration and Nationality Act, possession of counterfeit securities is "an aggravated felony" to the extent that Mr. Nguyen's plea agreement specified that his fraudulent conduct had resulted in over $10,000 in losses under 8 U.S.C. §101(a)(43);[122] that "[a]ny alien who is convicted of an aggravated felony ... is deportable" under 8 U.S.C. § 1227(a)(2)(A)(iii); and that any person convicted of "an aggravated felony" on or after November 29, 1990 was "permanently barred from establishing good moral character" and would thus be permanently "ineligible for naturalization" under 8 U.S.C. §§316(a)(3), 101(f)(8), and 101(a)(43)(D).[123]

With respect to *Strickland*'s prejudice prong, the affidavits of Mr. Nguyen and Attorney Carney amply demonstrate 'a reasonable probability that, but for counsel's errors, [Mr. Nguyen]

---

[120]Carney Aff. ¶8; Nguyen Aff. ¶¶23; Ex. ### to Nguyen Aff.;
[121]Carney Aff. ¶11 & Ex. E; Nguyen Aff. ¶25
[122]*See* Nguyen Aff. ¶20 & Ex. C, ¶3(b).
[123]*See* Nguyen Aff. ¶27 & Ex. F. *See also Castro-Taveras,* 841 F.3d at 51 n.15

would not have pleaded guilty and would have insisted on going to trial,'"[124] unless he could have "negotiated a plea that did not impact [his] immigration status."[125] Mr. Nguyen asserts, quite credibly, that given his profound fear of deportation to Vietnam, if he had "known that the legal advice [he] received was legally incorrect, [he] would not have pleaded guilty and would have either held out for a better plea deal or would have gone to trial,"[126] an assertion that is fully corroborated by Attorney Carney, and is fully consistent with Attorney Carney's longstanding practice.[127]

**D.     Mr. Nguyen is independently entitled to a writ of audita querela of other similar relief.**

Even if the Court concludes that Mr. Nguyen has not made the legal showing required for coram nobis relief, this Court is still entitled to weigh the equities more heavily and to grant a writ of audita querela or one of the other similar forms of relief discussed above in Sections 3(A)(3) to (5).

**E.     In this extraordinary case, this Court should exercise its discretion to issue the extraordinary relief requested.**

Given the clear existence of attorney misadvice constituting "fundamental error"; given Mr. Nguyen's diligent efforts over many years of trying to stave off deportation and preserve his ability to remain in this country; and given the personally tragic consequences that would result from his deportation to Vietnam, the consequent separation from his wife and children, and his potential exposure to ill treatment because of his devotion to America and his father's service to an allied regime, this Court should deem this to be one of those rare cases worthy of exercising its discretion to apply the "balm of coram nobis" — or of one of the other time-honored writs — in order to ensure that justice is done.

---

[124] *See Castro-Taveras,* 841 F.3d at 51 n.14 (*quoting Premo v. Moore,* 562 U.S. 115, 129 (2011) and *Hill v. Lockhart,* 474 U.S. 52, 59 (1985).
[125] *See Kovacs v. United States,* 744 Fl3d 44, 52 (2d Cir 2014).
[126] Nguyen Aff. ¶37.
[127] Carney Aff. ¶¶3,12.

## 5.    Relief requested.

For the above-stated reasons, Mr. Nguyen requests that this Court issue an order:

- directing DHS to refrain from placing Mr. Nguyen in removal or deportation proceedings during the pendency of these proceedings so that the constitutional rights asserted herein are duly examined by an Article III court according to the Constitution and the rule of law;

- issuing a writ of error coram nobis, a writ of audita querela, or some other similar relief, vacating Mr. Nguyen's conviction;

- scheduling an evidentiary hearing to clarify any doubts or ambiguities not resolved by reviewing the affidavits of Mr. Nguyen and Attorney Carney; and

- fashioning any other relief within this Court's equitable and legal powers that it deems just and proper.

Respectfully submitted,
Tien Nguyen,
By his attorney:

/s/ *Michael R. Schneider*
Michael Schneider
BBO #446475
GOOD SCHNEIDER
CORMIER & FRIED
Attorneys at Law
83 Atlantic Avenue
Boston, MA 02110
617-523-5933
ms@gscfboston.com

## CERTIFICATE OF SERVICE

I, Michael R. Schneider, hereby certify that this petition, along with the supporting memorandum, affidavits, and exhibits were served on all of the parties to this case by the CM/ECF System.

/s/ *Michael R. Schneider*
Michael R. Schneider

Dated: May 25, 2017